UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRADLEY BROCK,

Plaintiff,

vs.

CHIEF OF POLICE WILLIAM T. RILEY, III, OFFICER JOHN DOE, and CITY OF INKSTER,

Defendants.
______________________________/

Case No. 22-CV-10500

HON. GEORGE CARAM STEEH

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 18)

Plaintiff, Bradley Brock, filed this action against the City of Inkster, former Chief of Police William T. Riley, and Officer John Doe (now identified as Officer Clary). Plaintiff alleges an unlawful seizure of his dog in violation of 42 U.S.C. § 1983 and the Fourth Amendment by Officer Clary, and a failure to train, supervise or discipline claim against the City of Inkster and former Chief Riley. Plaintiff also asserts state law claims of conversion, intentional infliction of emotional distress, and gross negligence against Officer Clary. The matter is before the Court on defendants' motion for summary judgment (ECF No. 18). Upon a careful review of the written

submissions, the Court deems it appropriate to render its decision without a hearing pursuant to Local Rule 7.1(f)(2). For the reasons stated below, defendants' motion for summary judgment is granted as to plaintiff's failure to train claim and denied as to all other claims.

FACTUAL BACKGROUND

On November 15, 2021, at 11:11 p.m., plaintiff called the Inkster Police Department to report that an employee at the Marathon gas station on Michigan Avenue in Inkster, Michigan pulled a firearm on him. Plaintiff stated that he was wearing a grey hoodie and would meet the officers at the Flower Bowl Recreational on Michigan Avenue, down the street from the gas station. Plaintiff did not inform dispatch that he would have his 99-pound Mastiff dog, Moose, with him. Units were dispatched to investigate.

Officer Clary was the first officer to arrive. Video of the scene was captured by a drone flying 20 feet above the location and operated by Antonio Williams, a security guard at the Flower Bowl Recreational. The video shows an aerial view of the events. Officer Clary exited his vehicle and plaintiff approached him on foot. Moose was across the side street, sitting under a sign, unattended and unleashed. Clary and plaintiff spoke for a few seconds when they were interrupted by a passing pedestrian. The

pedestrian aroused Moose's attention, and the dog walked over. As Moose sniffed the pedestrian, plaintiff tried to restrain the dog. Moose then noticed Officer Clary and walked toward him. Clary pulled his firearm and began walking backward, behind his patrol car and down the grassy strip along Michigan Avenue, all the while pointing his gun at Moose. After Clary passed behind his patrol car and approached Michigan Avenue, the distance between him and Moose increased. Meanwhile, plaintiff followed behind Moose, reaching Moose as he passed behind the patrol vehicle, but never restraining him. As Clary stepped into Michigan Avenue, he shoots at Moose, who then changed direction and limped away. These events occurred over approximately ten seconds.

Officer Clary described his perception of the events at his deposition and in his incident report. He states that he saw plaintiff and Moose approach shortly after he arrived on the scene. Plaintiff placed the dog about 150 feet away and told him to stay before he approached Clary and told him that Moose was his dog. When the pedestrian walked by, the dog began to run toward him. Clary then commanded plaintiff to restrain his dog. "[A]s soon as I started yelling being direct and being stern with Mr. Brock, the dog turned and then just started aggressively charging at me."

Clary dep., p. 16; ECF No. 18-4, PageID.185. Clary took "8-10 steps backward, in a fast manner" while yelling for plaintiff to get the dog. Report, ECF No. 18-3, PageID.160. Plaintiff did not restrain the dog, and Clary was now standing in the street. Clary was afraid of being hit by a car or being attacked by a large dog, so he fired two shots. The dog kept coming toward him so he fired two more shots at the dog until it changed direction and limped away. Clary dep., p. 17; ECF No. 18-4, PageID.186.

Plaintiff testified that at the beginning of the encounter, he told Clary that Moose was his dog and that he was training him to be his service dog. Brock dep. at p. 23; ECF No. 18-6, PageID.253. Plaintiff described Moose as wagging his tail and not being aggressive as he approached the pedestrian and then Clary. While Moose was walking toward Clary, plaintiff ran after Moose to try to restrain him while telling Clary, "stop, please stop, please stop, he's friendly, he is training to be a service dog." *Id*. at p. 24.

The security guard, Mr. Williams, also observed the events from his car. He testified that when Moose walked toward the pedestrian, and then toward Officer Clary, he was wagging his tail. He did not perceive that the dog charged at Clary or posed a threat. Williams dep., p. 10-11; ECF No. 18-8, PageID.302-303.

Following the shooting, Clary reported to dispatch that shots were fired on a dog. Officers Maceachern and Dukes arrived on the scene and stayed with plaintiff while he comforted Moose. After approximately 40 minutes, plaintiff was permitted to leave and take Moose to an emergency veterinarian, where he was determined to be in critical condition. Ultimately plaintiff elected to euthanize Moose and was billed $752.00 for the veterinary's emergency services. Plaintiff was issued a misdemeanor citation for having a dog at large under City of Inkster Ordinance § 91.15. Plaintiff plead no contest, was found guilty of having an unleashed dog, and was sentenced to a civil fine of $500 plus $200 in court costs.

Officer Clary testified that he received no training at the police academy regarding dog encounters. Clary dep., p. 7; ECF No. 18-4, PageID. 176. He also did not receive any training on how to handle dogs during his field training with the City of Inkster prior to the incident. He did receive such training from the City following the incident. *Id*. at p. 9. Clary testified there was an internal investigation, but he was not disciplined. *Id*. at p. 32.

LEGAL STANDARDS

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the

non-moving party. *Tolan v.* Cotton, 572 U.S. 650, 660 (2014); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (*citing Anderson*, 477 U.S. at 252).

## ANALYSIS

### I. Qualified Immunity – Officer Clary

Defendants raise the affirmative defense of qualified immunity for Officer Clary for the § 1983 unlawful seizure claim. Under this doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Marcilis v. Twp. of Redford*, 693 F.3d 589, 598 (6th Cir. 2012) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). "An official may, however, be held personally liable for civil damages for unlawful official action if that action was not objectively reasonable in light of the legal rules that were clearly established at the time it was taken." *Id*. (citing *Cochran v. Gilliam,* 656 F.3d 300, 306 (6th Cir. 2011) (internal quotation marks omitted)). Whether an action was "objectively reasonable" considering clearly established rules is "a fact-specific, case-by-case" inquiry focused on "whether a reasonable official in the defendant's position could have believed that his conduct was lawful, judged from the perspective of the reasonable official on the scene." *Id.* To determine whether an official is entitled to qualified immunity, the Court

must answer two questions: "whether a defendant violated a constitutional right and whether the right was clearly established." *Id*. (citing *Bishop v. Hackel,* 636 F.3d 757, 765 (6th Cir. 2011)). Because this is the summary judgment stage, the Court considers the facts in the light most favorable to the plaintiff. *Plumhoff v. Rickard*, 572 U.S. 765, 768 (2014).

There is a clearly established "constitutional right under the Fourth Amendment to not have one's dog unreasonably seized." *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 566 (6th Cir. 2016). However, "[s]hooting a pet, while always unfortunate, is not always unreasonable. An officer may reasonably use lethal force against a pet that poses an "imminent threat." *White v. City of Detroit, Michigan*, 38 F.4th 495, 498 (6th Cir. 2022) (citing *Brown*, 844 F.3d at 568). When determining whether a particular threat is imminent, consideration should be given to "the perceived likelihood, nature, and severity" of the threat. *Id*. (citing *Brown*, 844 F.3d at 568–70; *Richards v. City of Jackson*, 788 F. App'x 324, 333–35 (6th Cir. 2019)). Because police officers are often called upon to "make split-second judgments" about their use of force in "tense, uncertain, and rapidly evolving" circumstances, the situation must be viewed from the perspective

of a "reasonable officer on the scene," and not through hindsight. *Id*. (citing *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)).

Qualified immunity has been found to shield officers from federal liability for killing dogs in other cases. Where a canine unit was searching for a weapon discarded by a fleeing suspect, and a pit bull escaped its fenced yard and bit and held on the K-9 officer's snout, the Sixth Circuit found the officer who shot and killed the pit bull acted reasonably and was entitled to qualified immunity. *White*, 38 F.4th 495. Another case upheld a finding of qualified immunity for officers who shot two pit bulls while executing a search warrant on the suspected drug house of a known, dangerous gang member. In that case, the pit bulls, large and unleashed, were lunging and barking aggressively at the officers, in the small residence. The Sixth Circuit concluded that the officers acted reasonably in shooting and killing the dogs. *Brown*, 844 F.3d at 572.

Viewing the situation from the perspective of Officer Clary, the Court finds that there is an issue of fact whether Moose posed an imminent threat such that Clary acted reasonably in shooting the dog. Certainly, Officer Clary was on high alert as he was the sole officer investigating an assault involving a firearm, it was dark, he had yet to collect much, if any,

information from plaintiff, a third person entered the scene, and a 99-pound unleashed dog was approaching him as he ran backward toward the street. The fact that plaintiff informed the officer that Moose was his dog, and even that Moose was friendly, does not minimize Clary's perception that Moose was very large, unleashed, and headed toward him. But when viewed in the light most favorable to plaintiff, the evidence shows that Clary may have overstated the risk posed by Moose. While Clary described Moose's gait as "running" and "charging", the video supports plaintiff's account that Moose was walking, in a manner that could be described as purposeful. Plaintiff and Mr. Williams describe Moose's demeanor as happy, wagging his tail, and posing no threat. There is no indication that Moose was barking or growling at any time. The video also shows the distance between Clary and Moose increasing and that plaintiff was standing quite close to Moose when Clary fired shots at the dog. Because the video is taken from a birds-eye view rather than the view of Officer Clary, a jury would be in the best position to evaluate the evidence from his perspective, as well as the veracity of the witnesses.

The Court is cognizant that the only relevant question is whether Officer Clary acted reasonably at the time of the seizure. How the situation

came to be, and what might have happened if the events were allowed to play out are not relevant. *White*, 38 F.4th at 500 (citation omitted). Based on the evidence presented, a fact finder that accepts Clary's version of events could find that Moose posed an imminent danger to Clary at the time he fired the shots. But a fact finder could also find that the danger was not imminent at that moment, given the evidence of Moose's demeanor, his distance from the officer, and the proximity of plaintiff. As there is an issue of material fact, the court denies defendant's motion for summary judgment on Clary's assertion of qualified immunity.

II. Monell Claim - City of Inkster and Former Chief Riley

A municipal entity may be held liable for constitutional deprivations under the *Monell* theory of liability when the deprivation is caused by "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Simpkins v. Boyd Cnty. Fiscal Ct.*, No. 21-5477, 2022 WL 17748619, at *12 (6th Cir. Sept. 2, 2022) (quoting *Alkire v. Irving*, 330 F.3d 802, 818 (6th Cir. 2003)). To demonstrate *Monell* liability, plaintiff must (1) identify the policy or custom that injured him; (2) connect the policy to the City of Inkster and/or former Chief Riley; and (3) show that Moose's

shooting was incurred due to execution of that policy or custom. *See id*. There are four methods of proving an unlawful policy or custom: (1) showing an illegal official policy or legislative enactment; (2) demonstrating that an official with final decision-making authority ratified illegal actions; (3) showing a policy of inadequate training or supervision; or (4) demonstrating a custom of tolerance of or acquiescence to federal rights violations. *Wright v. City of Euclid*, 962 F.3d 852, 880 (6th Cir. 2020).

Here, plaintiff alleges that the City and Riley maintained a policy of inadequate training and supervision regarding the use of force, de-escalation, and interactions with dogs belonging to members of the community. Inadequate training only forms the basis of liability "where the failure to train amounts to *deliberate indifference* to the rights of persons with whom the police come into contact." *Brown*, 844 F.3d at 573 (citation omitted). To establish deliberate indifference, the plaintiff "must show prior instances of unconstitutional conduct demonstrating that the [City] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Id*. "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to

train," although there are rare circumstances in which "the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id*. (citing *Connick v. Thompson,* 563 U.S. 51, 64 (2011)).

In support of his claim, plaintiff cites to Officer Clary's deposition testimony that he received no training from the police academy or the City on how to deal with dogs prior to this incident. He also points out that the City's only written policy regarding dogs pertained to its K-9 dogs, not interactions with pets or animals in the community. However, plaintiff does not provide evidence, such as prior instances of dog shootings by police officers, that demonstrates the City ignored a history or pattern of abuse that put it on notice that training was deficient and likely to cause injury. On the other hand, defendants submit former Chief Riley's Declaration stating that during his tenure, which began in August 2015, the instant case is the only time he or the City of Inkster was sued for the unconstitutional seizure and/or shooting of animals. Riley Decl. ¶ 9; ECF No. 18-15, PageID.397.

The City's police officers rely on Animal Control officers when they have advance notice of an uncontrolled animal. Chief William Ratliff Affidavit, ¶¶ 19-22; ECF No. 18-14, PageID.387. Officers are also trained in

use of force continuum and search and seizures. Here, Officer Clary did not have advance notice of Moose, so he had to use his discretion under the use of force continuum.

Following the incident, the Inkster Police Department, under the direction of former Chief Riley, held an all-officer mandatory Canine Behavior Training lead by the Michigan Humane Society. This training is not an admission of a deficiency in the City's training of its officers. See *City of Canton, Ohio v. Harris*, 489 U.S. 378, 392 (1989) ("In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident.") Rather, the added training demonstrates that upon notice of an issue, the City of Inkster Police Department provided its officers with appropriate training to assist them in addressing such situations in the future.

The Court finds that plaintiff has failed to present evidence to meet the deliberate indifference standard in connection with his *Monell* claim against the City and former Chief Riley such that summary judgment is granted in favor of defendants.

III. State Tort Claims – Officer Clary

A. Conversion

Under Michigan's common law, conversion is defined as "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Magley v. M&W, Inc*, 325 Mich. App. 307, 314 (2018) (citation omitted). It is plaintiff's burden to establish an ownership interest in the property and a superior right of possession as to defendant for common-law conversion*. D'Anna v. Furgal*, No. 320652, 2015 WL 5487927, at *3 (Mich. Ct. App. Sept. 17, 2015) (citing *Thomas v. Watt,* 104 Mich. 201, 207, 62 N.W. 345 (1895)). Defendant argues that plaintiff has not established ownership or possession of Moose at the time of the alleged conversion because he testified that he did not pay for the dog and the dog did not have a license or a leash. However, the evidence supports plaintiff's claim that he possessed Moose in that he housed and cared for him, took him to the veterinarian and paid the fees for his care. The fact that Moose was unleased and unlicensed does not negatively impact plaintiff's claim of ownership or possession. *See Smith v. City of Detroit, Michigan*, 751 F. App'x 691, 696 (6th Cir. 2018).

Defendant's motion for summary judgment on plaintiff's claim of conversion is denied.

B. Intentional infliction of emotional distress

To establish a prima facie case of intentional infliction of emotional distress, a plaintiff must show: (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress. *Watkins v. City of Southfield*, 221 F.3d 883, 890 (6th Cir 2000). To prevail on his claim, plaintiff show that Officer Clary's "conduct exceeded the bounds of what the police could legally do." *Killian v. Fuller*, 162 Mich. App. 210, 217 (1987). As there is an issue of material fact whether Clary violated plaintiff's Fourth Amendment rights, summary judgment on this tort claim is denied.

C. Governmental Immunity

Michigan governmental employees are immune from intentional tort liability when they can establish that "(1) the employee's challenged acts were undertaken during the course of employment and that the employee was acting, or reasonably believed he was acting, within the scope of his authority, (2) the acts were undertaken in good faith, and (3) the acts were discretionary, rather than ministerial, in nature." *Odom v. Wayne C*ty., 482

Mich. 459, 461 (2008). The good-faith requirement "imposes a subjective test for governmental immunity for intentional torts, based on the officials' state of mind, in contrast to the objective test for federal qualified immunity." *Brown v. Lewis*, 779 F.3d 401, 420 (6th Cir. 2015); *Odom*, 482 Mich. at 481-82. The jury will have to assess Officer Clary's credibility to determine whether or not he acted in good faith.

D. Gross negligence

Plaintiff's gross negligence claim alleges that Officer Clary owed a duty to plaintiff to act with ordinary care as would a reasonably prudent police officer under the same or similar circumstances. Specifically, plaintiff alleges that Clary had a duty to exercise due care in the safe use of his weapon and that his actions in discharging his gun in the vicinity of innocent civilians was reckless. By statute, Michigan defines gross negligence as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(8)(a).

Defendant argues that because plaintiff was issued a misdemeanor citation for having a dog at large under a City of Inkster ordinance, Officer Clary did not owe him a duty of care. The Michigan Supreme Court has held that a police officer owes a duty of care to innocent persons, but not to

wrongdoers in the context of a police chase. *Robinson v City of Detroit*, 462 Mich. 439, 450-51 (2000). However, in *Robinson*, the court used the term "wrongdoer," not to refer to someone doing something wrong, but to a person whose conduct gave rise to police pursuit. *Cameron v. City of Flint*, No. 361502, 2023 WL 5313593, at *3 (Mich. Ct. App. Aug. 17, 2023). It is not clear that the *Robinson* line of cases, which apply to police chases, would be extended to this situation.

Defendant also argues that plaintiff cannot satisfy the proximate cause standard because plaintiff's lack of control over his dog, rather than the officer's action, was the proximate cause of his injury. The Court disagrees. The facts viewed in light most favorable to plaintiff demonstrate that the officer's decision to fire his weapon at Moose was the "one most immediate, efficient, and direct cause of the injury or damage to Moose, and consequently to plaintiff. *See Richards v. City of Jackson, Michigan*, 788 F. App'x 324, 337 (6th Cir. 2019).

There is an issue of fact whether Officer Clary's actions were "so reckless as to demonstrate a substantial lack of concern for whether an injury results." Defendant's motion for summary judgment as to plaintiff's gross negligence claim is denied.

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment (ECF No. 18) is GRANTED IN PART AND DENIED IN PART.

Dated: October 18, 2023

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on October 18, 2023, by electronic and/or ordinary mail.

s/Michael Lang
Deputy Clerk